ALEXANDER EDMUNDS, Plaintiff in Error, *v.* JOHN MYERS *et al.*, Defendants in Error.

ERROR TO LOGAN.

When a patent for an invention of a cradle had been assigned for certain counties, and the assignee had availed himself of the assignment, by making sales under

it, and then applied by bill in equity, to have the contract rescinded, and the consideration he had paid for the assignment restored to him, alleging fraud and deception in the transaction, but did not propose to account for what had been received by him under the assignment: *Held*, that a decree ordering a rescision of the contract, a re-assignment of the patent, and a restoration of the consideration paid for the assignment, was erroneous, inasmuch as the vendor could not thereby be restored, in an equal degree, to the condition in which he was before the contract was made.

If a fraud has been practiced, as in the sale of a pretended patent, the court may rescind the contract and compel a return of what has been paid under it; but it will at the same time compel the complainant to account for what he received, and the profits derived from the use or sale of it.

A contract will not be rescinded in equity, leaving the complainant to perform his part of the decree by subsequent acts, but he must do equity on his part, before he can have a decree for the relief he seeks.

If the assignee of a patent has derived advantages or profit from it, and then seeks to have the contract for the assignment rescinded for fraud, he should aver, in his bill, that the benefits received by him, were so received prior to the discovery of the fraud. And he should also return, or proffer to return, the consideration received by him.

A patent issued for a "Design for a Cradle," the specifications being for an "ornamental design, in the shape or configuration of horological cradles, and of ornamental designs to be worked thereon;" and a deed of sale of the patent having a caption, "A. B.'s Patent Horological Cradle," and which recites that A. B. had obtained a patent from the United States for an "Horological Cradle:" *Held*, that this phraseology would not import that there was machinery about it, or that a "principal, machinery, or mode of operation," was the subject of the patent; and that every one should be presumed to know that a "baby cradle" would not be patentable by that description, so far as the application of its use is concerned.

THIS bill states, that prior to 12th of December, 1853, the said Edmunds professed to have invented an horological cradle, which was to be rocked by machinery, with a weight, running on one or more pulleys; the cradle constituting the pendulum, and which, being wound up, would rock itself until it run down, and so save the continual labor to mothers and nurses, of rocking the cradle; and professed to have obtained a patent for the said invention, and had, at and before that day, been exhibiting at Mount Pulaski, where the parties to this suit all resided, a model of said pretended invention, and had been, and then was, recommending his said pretended invention, as a most useful invention, and insisting that the invention which he claimed to have made was, and would be, so useful and convenient, that the patent right would be universally valuable, and could be sold for a large sum of money, and represented that he had obtained letters patent of the United States, for said cradle. All of which representations he made to complainants and others, on a proposition to sell them an interest in said pretended letters patent, who, confiding in such representations, agreed with him to purchase all the right, title and interest which he had in said patent to and in certain specified territory, at the price of two thousand dollars. In pursuance of said agreement, said Edmunds executed to said complainant his certain deed of transfer, reciting

" that, whereas, the said Alexander Edmunds, of Mount Pulaski, in the county of Logan and State of Illinois, did obtain letters patent of the United States, for *a horological cradle*, which letters patent bore date the 22d day of February, 1853," and said indenture witnesses, that for and in consideration of the sum of two thousand dollars, in hand paid, said Edmunds assigned, sold and set over to the said complainants all the right, title and interest secured to him by said patent, for, to and in the aforesaid territory. In consideration of which, said complainant conveyed, or caused to be conveyed, to said Edmunds, certain land, situated in said county, which was taken and received by Edmunds as and for $2,000, the consideration of said transfer; that they relied on the representations then orally made, as well as made in said deed, that said Edmunds had secured by patent the sole right of making, using and vending, etc., said horological cradle, according to the models exhibited by him, and what the said Hildreth and Turner believed, and were induced by Edmunds' representations to believe, was peculiarly valuable about said pretended invention, pretended to be secured by said patent, was the *principle* and *machinery* and *mode of operation* by which said cradle was put and kept in motion, and which principle, machinery, and mode of operation, Edmunds represented to complainants were secured by said patent.

That complainants have never until recently seen said patent; that they have now discovered that said Edmunds has really no letters patent for said horological cradle, or for its machinery, mode of operation, or its principle of action ; but your orators have discovered, by procuring a copy of the letters patent of the United States to said Edmunds, that they only secured to said Edmunds a *design for a cradle*, and the specifications of his claim for said letters patent only claims, as the production of the said Edmunds, the *design and configuration of the ornaments described and set forth, forming together an ornamental design for an horological cradle.*

They charge that such representations were falsely and fraudulently made. But if that is not so, then the parties were mutually mistaken. And they pray that Edmunds be decreed to convey said lands to complainants.

The defendant denies all the aforesaid representations, and the said sale to Turner and Hildreth ; says he sold to Turner alone, and received the land in consideration thereof; that Turner afterward sold one-half of his purchase to Hildreth, and returned to Edmunds his deed of assignment, and procured him to execute the said deed, set forth in bill to Hildreth and. Turner.

14

A decree that Edmunds convey the land to complainants, was rendered by DAVIS, Judge, at the September term, 1854, of the Logan Circuit Court.

WILLIAMS and LAWRENCE, for Plaintiff in Error.

A. LINCOLN, for Defendants in Error.

SCATES, J.    Myers filed this bill for the rescission of a contract, by written assignment of Edmunds, of his patent to a horological cradle in certain counties in this State, and a re-conveyance of a tract of land paid therefor, and the re-payment of five hundred dollars, paid him in goods and chattels.    The grounds set up for this equity are, the misrepresentation and fraud of Edmunds, in this, that he represented and sold to them a patent for the principle, machinery and mode of operation by which the cradle was put and kept in motion, whereas he had no patent for these, but only for the design, configuration and ornaments of such a cradle.    The fraud and misrepresentation are fully denied in the answer, which insists upon a want of equity in the bill, upon the further grounds, that no offer is made to re-assign the patent or re-convey it to plaintiff; that defendants made sales of patent rights for large sums, and that they do not offer to account for the values received on these sales; and that, on account of these sales, they cannot restore the patent fully to plaintiff.

The court decreed a rescission of the contract, a re-conveyance of the land, and the payment of four hundred dollars by plaintiff, and that defendants re-convey or assign the patent.

The decree is erroneous in two points of view.    Suppose the evidence sustained the allegations of the bill as to the fraud and misrepresentation, while the rescission of the contract might therefore be equitable and just to the defendants, yet it is clearly shown by the evidence that defendants have sold the patent for part of the territory included in their purchase, and received large sums of money or property therefor.    Now that portion of the decree that orders a return of the consideration by plaintiff,—the land and the money,—restores the defendants to all their rights,—to the condition they were in before the purchase.    But the plaintiff is not restored to his, by a decree simply, for a re-conveyance or re-assignment of the patent. This re-assignment cannot affect the rights of purchasers from defendants, nor does the decree require defendants to account for the receipts and profits on these sales.

One of the boasted advantages and cherished objects of a court of equity is to administer complete relief, and do ample

justice to both parties. I know that where a transaction is tainted with fraud, for which a court of equity is simply asked to annul the contract and avoid the writings, the parties may be left to assert their remedies at law for mutual restoration of their rights, and compensation in damages. But where, as here, the party seeks the further specific relief to have the property restored, and to be put in *statu quo*, he must come, not only with clean hands, but ready and willing to do whatever may be necessary on his part to render equal justice to the other party, by restoring to him the property he may have received, or its value, if put beyond his control, if damages, instead of the specific property, would be equitable. I am speaking of executed agreements. Executory contracts would require nothing more than a delivery up and cancellation of the writings. Courts will rescind and cancel such contracts upon less proofs than will be required to disturb agreements which have been carried into effect by delivery and exchange of their mutual rights, interests and possessions.

The want of consideration might induce a court to withhold its aid in enforcing a contract, but could not afford a ground for rescission of an executed agreement.

So upon this ground proceeded the case of *Taylor* v. *Hare*, 4 Bos. and Pull. R. 260, which was an action to recover back moneys paid for the use of a patent, brought after the discovery that the patent was void, the patentee not being the inventor. Heath, J., puts the case very strong: that " there never has been a case, and there never will be, in which the plaintiff, having received benefit from a thing which has afterwards been recovered from him, has been allowed to maintain an action for the consideration originally paid. We cannot take an account here of the profits. It might as well be said, if a man lease land, and the lessee pays rent and afterwards be evicted, that he shall afterwards recover back the rent, though he has taken the fruits of the land." And this is abundantly confirmed by the English decisions. Norman on Patents, 149 to 151, (52 Law Lib. 118).

But for a fraud, the court will rescind and return what has been paid; yet I presume it will hold the complainant to account for what he had in exchange, and for the profits he has derived from its use or sale. *Waters* v. *Lemmon*, 4 Ohio R. 229 ; *Camplin* v. *Burton*, 2 J. J. Marshall R. 216 ; *Yoder* v. *Swearingen*, 6 J. J. Marshall R. 518. See also 3 B. Monr. R. 129 ; 6 Monr. R. 102 ; 4 Litt. R. 12 ; 6 Gill. and John. R. 424 ; 1 Freem. Ch. R. 35.

Courts have the power to impose terms, (1 Story Eq. Juris., Sec. 439; 2 ibid. 696-7, 707), and he that asks must do equity.

Contracts will not be rescinded and complainant left to perform his part of the decree by acts to be afterwards done, but the doing equity is a precedent condition of his right to a decree for the relief he seeks. 4 Ohio, 229; 2 J. J. Marsh. 216; 6 ibid. 518.

Defendants should have promptly notified plaintiff when they discovered the supposed fraud, and of what use they intended to make of it; whether to rescind the contract or insist on damages, (*Boyce, Executor,* v. *Grundy,* 3 Pet. R. 214; Walk. Mich. Ch. R. 186, 373; Harring. Ch. R. 102, 301, 427), and, if they chose to rescind, should have tendered a return of the consideration received by them; or, at least, made an offer to return. 3 B. Monr. R. 159; 4 Litt. R. 12. This has not been shown, neither in the bill nor the evidence, while it is in evidence that they had sold the patent for a part of the territory, and could not recover that part, nor had any account for the proceeds of these sales been either offered by the bill or ordered by the decree. Plaintiff, under this decree, will be left to bring his action at law, or file a bill to recover back the interests he had in the patent, and so but partial justice will be done in this case. 10 Yerg. R. 59.

For anything apparent in the pleadings or proofs, defendants may have made the sales after their discovery of the alleged fraud, first trying what speculation they could make, and failing in that, they file this bill to rescind. If this is not so, it should be negatived by averments. They have concealed the fact, or failed to show it in the bill, that they had made any sales, but it comes out in the answer and proofs. Having enjoyed and used the patent under the purchase, they have derived advantages and profits from it; and upon this principle the case of *Chanter* v. *Dewhurst,* 12 Mees. and Wels. R. 823, was ruled, and many others referred to, in Norman on Patents, 150, (52 Law Lib. 119.)

I have thus shown that the decree is erroneous, upon the supposition that the proofs sustained the suggestion of fraud, which is the ground upon which relief is sought.

But the defendants wholly failed in their evidence. No witness testifies to any representation whatever being made to them. No negotiation between the parties is shown; and no other contract but the plaintiff's deed of assignment of the patent. There is much testimony as to plaintiff's general conversations about his patent, and as to what he claimed under the patent, and as to the general reputation and impressions of the neighborhood as to the extent of what he claimed under it. This, if not wholly irrelevant, though taken without objection, is very unsatisfactory, had defendants even succeeded in this

manner to make out a fraudulent representation and sale.   But so far from it, the proof shows that plaintiff, when speaking particularly of the *claim*, under his patent, always confined it to the particulars patented; and only used general language, when speaking of the patent generally, without reference to the claim.   Had all these conversations formed part of the particular negotiation with defendants, we should have no hesitation in dismissing this bill.   Besides, the patent, specifications and drawings, are shown to have been kept in plaintiff's shop, where these cradles were being made as models, at his house, and other places ; and that defendants were in and out, like others. They might have seen them, as others did, and we cannot resist the conclusion that they did see and examine them, either before they purchased, or before they sold under it; for between those periods, plaintiff had them a model made, and they were in and out, and giving directions while it was constructing.

The only evidence therefore offered is, that contained in the patent itself, which is for a " Design for a cradle," the specifications, which are for an " ornamental design in the shape or configuration of horological cradles, and of ornamental designs to be worked thereon," and the deed of sale, which has a caption, " Alexander Edmunds' Patent Horological Cradle," and which recites that he had obtained a patent from the United States for an " Horological Cradle."   Neither the phraseology of the one or  the other *imports* that there was machinery about it, and of course cannot imply that that " principle, machinery or mode of operation " was the subject of the patent.   Every one should be presumed to know that a " Baby Cradle " would not be patentable, by that description, so far as the *application* of its *use* is concerned ; for we may indulge the presumption that it was as well known to Adam as to Edmunds.   And so too, of numberless forms, from the natural rind of a tree, or hollow gum, to the more elegant conceptions of mechanical invention.   What particular change is to be inferred, or instrument is imported by the word " Horological," is rather a question of fact, than of law.   The law will as readily intend a " Grain " as a " Baby " cradle ; so far as either is suggestive of, or adapted to, the art of measuring time.   This may be done by a " principle " " or mode of operation," adopted in the hourglass and the dial, as well as by machinery ; and in the latter, whether by weights or pulleys, or by springs.   If we attempt to make its import a question of law, instead of fact, as to the meaning of the party, we are at once involved in the necessity of determining that the deed secured the right to use some one or all these modes of measuring time with a cradle.   On the contrary, it is very evident, that an arbitrary selection of a

name was made, for the thing patented; and to the patent and its specifications and drawings, a prudent man would have had recourse, unless prevented by fraudulent representations, which are not shown here.

Decree reversed, and bill dismissed.

*Decree reversed.*

